# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF PUERTO RICO

RECEIVED CASHIER
CLERK'S OFFICE USDC PR

2024 SEP 13 PM 3:12

## COMPLAINT

RANDA JOHNSON

124 Fern Street

Waterbury, Ct  06704

Case No. 24- 1423 (GMM)

Plaintiff,

18 U.S.C. 1961-1968 claim

for damages and injunctive

relief

Vs

42 U.S.C. 1983 claim

for damages and injunctive

relief

GUSTAVO HIGUEREY, Officer of Liquidators Ware House, LLC, 327 Bellevue, LLC, La Terraza de San Juan, LLC and 377 Ferrer, LLC in his individual and official capacities,

LA TERRAZA DE SAN JUAN

DEBORAH CAMEJO, General Manager at La Terraza de San Juan, LLC, in her individual and official capacities,

LIQUIDATORS WARE HOUSE, LLC

1

327 BELLEVUE, LLC

377 FERRER, LLC

HYMAN MAMIYE, Officer of SM Reparto Metropolitano, LLC, in his individual and official capacities,

SM REPARTO METROPOLITANO, LLC (Puerto Rico)

MCM EQUITIES, LLC (New York)

CHUCK MAMIYE, in his individual and official capacities,

SM REPARTO METROPOLITANO, LLC (New York)

ULTIMATE REALTY, LLC (New York)

JOE SABBAGH, Founder and CEO of Ultimate Realty, LLC, in his individual and official capacities,

MARALIZ RIVERA ORTIZ, Officer of Sabbagh Property Management, LLC, in her individual and official capacities,

SABBAGH PROPERTY MANAGEMENT, LLC

ANNETTE MARTINEZ ORABONA, Attorney at Oficina Legal Communidad, TS No. 15846, in her individual and official capacities,

RAFAEL E. RODRIGUEZ RIVERA, Executive Director at Oficina Legal Communidad, TS No. 8448, in his individual and official capacities,

JAVIER RIVERA TORRES, Attorney at Oficina Legal Communidad, TS No. 21487, in his individual and official capacities,

OFICINA LEGAL COMMUNIDAD

SERVICIO LEGALES DE PUERTO RICO

HADASSA SANTINI COLBERG, E.D., Executive Director at Servcio Legales de Puerto Rico, TS No. 6745, in her individual and official capacities,

NILDA MUNOZ VISSEPO, Attorney, TS No. 8988, in her individual and official capacities,

VALERIE CINTRON CONCEPCION, Judge at Tribunal de Primera Instancia de San Juan, TS No. 18824, in her individual and official capacities,

MIQUEL A. PABON QUINONES, SR, in his individual capacity

MIQUEL A. PABON, JR, in his individual capacity

EDITH FIGUEROA ROQUE, Officer at Puerto Rico Police Department, San Juan Division
(Precinct 466), Placa #18704, in her individual and official capacities,

PUERTO RICO POLICE DEPARTMENT, SAN JUAN DIVISION
LEANDRO SIFUENTES JR., in his official capacity

PUERTO RICO POLICE DEPARTMENT, SAN JUAN DIVISION

Defendants.

---

## COMPLAINT

TO THE HONORABLE COURT:

COMES NOW Plaintiff, Randa Johnson, appearing pro se, and respectfully states, alleges, and
prays as follows:

### Nature of Action and Jurisdiction

1. On September 14, 2023, Judge Valerie Cintron Concepcion's eviction order was executed
   without Randa Johnson receiving due process. This illegal eviction is the culminating act
   in a two-year period of organized misconduct perpetrated by Defendant Gustavo
   Higuerey and other members of a racketeering enterprise. The Plaintiff was not provided
   with notice of the date or time of the eviction, leaving her unprepared. Consequently, her
   security lock was broken, police raided her home, court official Yomaris Fajardo
   threatened to have Randa's dog sent to an animal shelter and put to sleep when she
   questioned the lack of service, her personal effects were placed on the street, some items
   were stolen, and she was left outside in the elements with nowhere to go, causing public

humiliation and embarrassment. These actions are part of the broader scheme of racketeering described in the RICO counts, reflecting the culmination of sustained illegal and unethical practices against The Plaintiff.

2. Plaintiff alleges that Defendants engaged in a coordinated and ongoing scheme to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. This scheme involved a pattern of racketeering activities, including but not limited to, acts of fraud, bribery, extortion, intimidation of an innocent party via real estate transactions, money laundering, murder for hire, and unlawful restraint, all designed to unjustly enrich Defendants and eliminate opposition, at the expense of Plaintiff. Led by Venezuelan expatriate Gustavo Adolfo Higuerey, who was wanted for international RICO violations, the enterprise sought to financially enrich itself and the other defendants through a coordinated scheme. The Plaintiff also alleges that the defendants, acting under color of law, deprived The Plaintiff of rights secured by the Constitution and laws of the United States and Puerto Rico, including rights to privacy, liberty, property, and other rights, privileges, and immunities. The actions of the defendants have caused significant harm to The Plaintiff and others, violating both federal and state laws.

3. Plaintiff's federal claim is instituted pursuant to 42 U.S.C. 1983 and 1988, and this court has jurisdiction over this action pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and 28 U.S.C. 1331 and 2201. Moreover, based on diversity of citizenship, as the parties involved are residents of different states/territories, and the controversy exceeds the statutory threshold of $75,000 required under 28 U.S.C. § 1332.

4. Plaintiff respectfully requests the following relief from the Court:

**Compensatory Damages**: Plaintiff requests compensatory damages for the significant harm and losses sustained due to the defendants' actions. This includes:

- **Physical Harm**: Any physical injuries or medical conditions resulting from the RICO actions enacted by the defendants.
- **Emotional and Mental Distress**: Compensation for the emotional and mental anguish caused by the wrongful eviction, harassment, and ongoing threats. This includes pain, suffering, anxiety, and any impact on The Plaintiff's quality of life.
- **Financial Losses**: Any financial losses directly related to the defendants' actions, including loss of business, costs incurred due to the eviction, loss of property, and other related expenses.

**Punitive Damages**: Plaintiff seeks punitive damages to deter the defendants and others from engaging in similar conduct in the future.

**Treble Damages:** Plaintiff seeks treble damages as authorized by law, to punish the defendants' willful misconduct and to deter similar unlawful actions in the future.

**Attorney's Fees**: Plaintiff requests an award of attorney's fees and legal costs incurred in pursuing this action, as authorized by applicable laws and statutes.

**Injunctive Relief**: Plaintiff seeks injunctive relief in the form of:

- **Federal Investigation and Protection**: An order directing the involvement of federal authorities, including but not limited to the FBI, to conduct a

comprehensive investigation into the ongoing threats, including a murder-for-hire plot, and to provide protection at Plaintiff's new location(s) and coordination with local authorities.

- **Order of Protection**: An order of protection against any current or future assailants acting on behalf of the criminal enterprise, to prevent further harassment, threats, or violence against Plaintiff and her family.
- **Confidentiality Orders:** To keep the identities and contact information of parties and witnesses confidential.
- **Physical Security Measures:** Such as increased security at court proceedings or personal protection if warranted.
- **Relocation Assistance:** In some cases, courts might be able to assist with relocation or other protective measures, though this is less common in civil cases

5. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to the claims in this complaint occurred in the District of Puerto Rico.

### The parties

1. Plaintiff Randa Johnson is a work-from-home educational consultant with a master's degree. She had been traveling throughout the U.S. and the Caribbean for a few years. Randa resided and worked from a hotel in San Juan for three months, paying in excess of $2,000 per month before her plans to return to Cuba were interrupted by COVID-19 border closures. To save money and invest the extra funds into marketing her business, Randa then moved to a residence at 327 Calle Bellevue in San Juan.

2. Gustavo Higuerey is a key defendant in this case and is alleged to have spearheaded a series of RICO violations. He is accused of employing bad business practices, fraud,

evasion of responsibility, harassment, bribery, and discrimination in orchestrating various attacks against The Plaintiff. These actions were conducted through his companies, including La Terraza de San Juan, LLC; Liquidators Warehouse, LLC; 327 Bellevue, LLC; and 377 Ferrer, LLC.

3. La Terraza de San Juan, LLC is a hotel located in the affluent district of Old San Juan. It is a company in which Higuery is an officer. The Plaintiff received an initial call from an employee, Deborah Camejo, from the hotel's official phone line, in late January 2022, informing her that Gustavo Higuerey was the new owner of 327 Calle Bellevue. Additionally, this hotel was the site where Higuerey was served with a Cease and Desist order and civil suit summons. Consequently, La Terraza de San Juan, LLC played a central role in the illegal activities directed against The Plaintiff.

4. Liquidator's Warehouse, LLC is the company Higuerey used to issue an illegal eviction notice to the defendant, which was placed on her door at 327 Calle Bellevue in March 2022. The Plaintiff, Randa Johnson, alleges that Higuerey used this shell company to conceal the true ownership of the house in order to evade and avoid redress. In eviction court in October 2022, the judge ruled in favor of Johnson, the defendant in that case, because Higuerey had no authority to sue for eviction through Liquidator's Warehouse, LLC, as it was not the legal owner of the property. Hence, this shell company was another tool Higuerey used to obscure the truth and obstruct proper legal processes against Johnson.

5. 327 Bellevue, LLC is the legal owner of the residence at 327 Calle Bellevue. This company, through its officer Gustavo Higuerey, initiated eviction proceedings against The Plaintiff, Randa Johnson, continuing the pattern of RICO violations. The eviction

was ultimately carried out without due process. As the legal owner, 327 Bellevue, LLC was responsible for turning off the water, leaving the property without electricity, and failing to provide an operational toilet due to the lack of water—all in an effort to harass and extort The Plaintiff. These actions violated The Plaintiff's rights and disregarded the company's legal responsibilities.

6. 377 Ferrer, LLC is another entity used by defendant Higuerey to convolute records and evade responsibilities through bad business practices. Higuerey has listed this company as the owner of 327 Calle Bellevue. An employee and/or co-owner of this entity, identified as Juan Fri, carried out the illegal lockouts and lock-ins of The Plaintiff at her residence at 327 Calle Bellevue. Juan Fri, the driver of a blue F150 pickup truck (license plate number 978-594), also yelled at The Plaintiff in the street, calling her a trespasser and claiming the courts had ordered her to leave prior to any eviction case. Additionally, he shut off the outside water spigot, which was The Plaintiff's only source of water, further adding to her harassment and peril.

7. Hyman Mamiye is a prominent figure in both the case and the real estate sector, associated with several business entities, including SM Reparto Metropolitano, LLC (Puerto Rico), which was the original owner of 327 Calle Bellevue when The Plaintiff rented the apartment. The Plaintiff alleges that Mamiye, along with other parties, conspired to sell the property at 327 Bellevue Street to evade financial responsibilities and circumvent The Plaintiff's legal rights. This alleged scheme involves a network of shell companies, with Mamiye's substantial experience and assets positioning him as a central figure in these transactions.

8. **SM Reparto Metropolitano, LLC (Puerto Rico)** is the legal entity that owned 327 Calle Bellevue at the time The Plaintiff entered into the rental contract and was subsequently injured. This entity is alleged to have been involved in the fraudulent sale of the property to co-defendant Gustavo Higuerey and his associated entities. Under the ownership of SM Reparto Metropolitano, LLC, threats were made to shut off utilities, including electricity, which were subsequently executed, exacerbating The Plaintiff's distress and contributing to the overall scheme to undermine The Plaintiff's legal rights. The corporate structure, involving multiple shell companies and sophisticated maneuvers, is indicative of a deliberate strategy designed to evade responsibility and is ideally suited for committing RICO schemes.

9. MCM Equities, LLC serves as an officer of SM Reparto Metropolitano, LLC, placing it centrally within a tightly-knit network orchestrated by Hyman Mamiye. The Plaintiff alleges that this network, potentially including Chuck Mamiye—a relative of Hyman Mamiye—represents a complex web of interrelated entities and individuals designed to shield key actors from responsibility. The Plaintiff contends that MCM Equities, LLC, while potentially more than a mere shell company, plays a significant role in this intricate network. This structure is purportedly engineered to obscure the true nature of operations and ensure that fraudulent activities and RICO violations remain hidden. The company's involvement is claimed to be crucial in facilitating and perpetuating the alleged corrupt activities, contributing to a broader conspiracy of mutual cover-up and deception.

10. Chuck Mamiye is a principal of MCM Equities, LLC, which is an officer of SM Reparto Metropolitano, LLC (Puerto Rico), the entity that owns 327 Calle Bellevue, the property involved in this case. Chuck Mamiye is potentially a relative of Hyman Mamiye, further

linking him to the broader network of entities implicated in the alleged scheme. The Plaintiff alleges that MCM Equities, LLC, under Chuck Mamiye's involvement, is part of a complex corporate structure orchestrated by Hyman Mamiye to evade responsibility and legal obligations. This structure includes multiple entities that are claimed to be involved in corrupt activities related to the RICO scheme against The Plaintiff. The familial connection between Chuck Mamiye and Hyman Mamiye, along with their roles in these interconnected companies, suggests a coordinated effort to facilitate the alleged fraudulent activities. As such, Chuck Mamiye is considered a key figure in the network and is included as a defendant due to his role in the operations and potential complicity in the RICO violations.

11. **SM Reparto Metropolitano, LLC (New York)** acts as an officer of **SM Reparto Metropolitano, LLC (Puerto Rico)**, further entrenching the convoluted corporate web orchestrated by Hyman Mamiye. The Plaintiff alleges that the New York entity is a strategically created shell company, mirroring its Puerto Rican counterpart, designed to evade financial responsibility and legal scrutiny. This duality of identity across jurisdictions is indicative of a sophisticated scheme to manipulate corporate structures for illicit purposes. Moreover, it is claimed that **SM Reparto Metropolitano, LLC (New York)** was intricately involved in the corrupt activities underpinning the RICO scheme directed against The Plaintiff, aiding in the execution and perpetuation of fraudulent practices.

12. **Ultimate Realty, LLC** operates as an officer of **SM Reparto Metropolitano, LLC (Puerto Rico)**, contributing to the complex corporate framework managed by Hyman Mamiye. Ultimate Realty, LLC is a prominent real estate investment management firm

founded in 1988, with offices in NY, NJ, and FL, and manages $250 million in assets across nearly 2 million square feet of industrial, retail, office, and multi-family properties. Despite its legitimate business operations, Ultimate Realty, LLC is implicated in this case due to its connection to the property management company of the same name. The founder, Joe Sabbagh, and his associates, Mark and Michael Sabbagh, are listed as key figures within the firm. This entity is directly linked to the property management company that rented the apartment to The Plaintiff. Maraliz Rivera Ortiz, the chief officer of this property management company, had a direct connection to the property owner, suggesting a deeper level of collusion and coordination. The Plaintiff alleges that **Ultimate Realty, LLC** played a critical role in the corrupt activities central to the RICO scheme, utilizing its extensive resources and corporate influence to facilitate and perpetuate the fraudulent practices against The Plaintiff.

13. Joe Sabbagh is the founder and CEO of Ultimate Realty, LLC, with significant oversight responsibilities over both the company and the property management activities conducted by Sabbagh Property Management concerning SM Reparto Metropolitano, LLC (Puerto Rico), the entity that owns 327 Calle Bellevue, the property involved in this case. Sabbagh Property Management, named after his family, manages the property, which suggests a personal connection to its operations. Given his high-level position and direct involvement in the property rental and management through a family-operated company, The Plaintiff believes that Joe Sabbagh likely holds substantial knowledge of and control over activities related to the property. The Plaintiff further alleges that Joe Sabbagh's oversight role, family ties to the property management, and connection to the rental suggest that he may be more than complicit in the RICO violations. His position and the

company's management of the property, where the alleged fraudulent and corrupt activities occurred, imply that he may have played an active role in or, at the very least, been aware of the RICO scheme against The Plaintiff. Therefore, Joe Sabbagh is considered a key figure in the case due to his significant oversight responsibilities and his potential direct involvement in the RICO violations.

14. Maraliz Rivera Ortiz is the rental agent who rented the unit to The Plaintiff and is directly responsible for the conditions that led to The Plaintiff's injuries. She is alleged to have illegally demanded payment or threatened to shut off utilities while an insurance claim was pending. Rivera Ortiz is also the agent responsible for communication with the owner and its representatives. Her threat to illegally turn off utilities was enacted in December 2021. The Plaintiff alleges that Rivera Ortiz spearheaded the attacks through misrepresentations and misconduct, which ultimately led to the conspiracy and racketeering scheme against The Plaintiff.

15. Sabbagh Property Management, LLC is the company where Maraliz Rivera Ortiz serves as an officer, and through which The Plaintiff rented the apartment. The Plaintiff had a contractual agreement with this entity, which is alleged to have breached the contract. This breach is claimed to have spiraled into further schemes and violations against The Plaintiff. The Plaintiff further alleges that Sabbagh Property Management, LLC is interrelated with Ultimate Realty, LLC and its founder, Joe Sabbagh. This intricate web of connections between the Sabbagh family entities and their officers reveals a close-knit network of companies. This network coordinated actions that obscured responsibility and shielded key players from liability, contributing to the broader RICO scheme. Additionally, The Plaintiff alleges that racial stereotypes and bias were disseminated

through this network, potentially influencing the actions of co-defendant Gustavo Higuerey. The dissemination of such stereotypes may have informed or reinforced decisions that resulted in the discriminatory treatment of The Plaintiff. By working together, Sabbagh Property Management, Ultimate Realty, LLC, and other connected entities are alleged to have played critical roles in facilitating fraudulent activities and perpetuating violations against The Plaintiff, potentially driven by racial bias.

16. Miguel A. Pabon Quinones, Sr., a neighbor of The Plaintiff, had extensive knowledge of The Plaintiff's predicament and the dangers she faced. It is alleged that he conspired with his son, Miguel A. Pabon Jr., to benefit from and participate in the RICO scheme orchestrated by Gustavo Higuerey and his associates. The Plaintiff further alleges that this scheme involved a murder-for-hire plot, wherein a mutual neighbor and tenant of Higuerey, along with the assistance of her new boyfriend, was hired to break into The Plaintiff's apartment with the intent to cause her harm. This conspiracy to inflict physical harm upon The Plaintiff demonstrates the extent of the malicious actions taken as part of the RICO scheme, highlighting the grave danger she faced due to the coordinated efforts of the defendants. The murder-for-hire element underscores the extreme lengths to which the defendants were allegedly willing to go in order to further their scheme and intimidate The Plaintiff.

17. Miguel A. Pabon, Jr. conspired with his father, Miguel A. Pabon Quinones, Sr., to aid in the RICO scheme against The Plaintiff. It is alleged that Pabon, Jr. played a central role in orchestrating a murder-for-hire plot targeting The Plaintiff, which was facilitated by Gustavo Higuerey. Pabon, Jr. is accused of recruiting the new boyfriend of Higuerey's tenant to carry out the attack, using tactics of isolation to make The Plaintiff more

vulnerable. As a result of these coordinated efforts, The Plaintiff continues to live in fear for her safety today, further illustrating the dangerous and ongoing nature of the conspiracy.

18. Attorney Javier Abraham Torres Rivera, of Oficina Legal Comunidad, was the acting counsel for The Plaintiff in seeking relief from the alleged actions of Maraliz Ortiz, Sabbagh Property Management, LLC, and Gustavo Higuerey. He is alleged to have failed to file injunctions as promised, purposefully violated attorney-client privilege, and did not ensure due process for the client. The Plaintiff's concerns grew when Torres Rivera's approach seemed to change after he and his colleague, Annette Martinez Young, began searching for the new owner. The Plaintiff believes this shift occurred when Higuerey and his associates may have influenced or bribed Torres Rivera, who is further alleged to have deliberately obstructed the case, intentionally undermined the legal process, and willfully neglected his duties, further harming The Plaintiff. The Plaintiff contends that these actions are part of a broader scheme to eliminate her by potentially destroying Torres Rivera's career and leading to his disbarment, thereby obstructing justice and potentially eliminating the proceedings against the involved parties. This belief is reinforced by a formal complaint filed against Torres Rivera with the Supreme Court of Puerto Rico. The Plaintiff asserts that such severe measures, including potential threats to her life, underscore the high stakes of this case and the extent of the alleged conspiracy.

19. Attorney Annette Martinez Orabona, a senior attorney at Oficina Legal Comunidad, assisted Attorney Javier Abraham Torres Rivera with The Plaintiff's case. The Plaintiff believes that Martinez Orabona's actions contributed to the lack of due process and implicated her in the RICO scheme as an active participant. As a senior counsel at

Oficina Legal Comunidad and having had official meetings and correspondence with The Plaintiff, she is considered responsible along with Torres Rivera.

20.  Attorney Raphael E. Rodriguez Rivera, the executive director of Oficina Legal Comunidad, is alleged to have been aware of The Plaintiff's case and authorized the illegal and unethical removal of Attorney Javier Abraham Torres Rivera from The Plaintiff's eviction case the night before the hearing. This action could potentially breach the contract between The Plaintiff and the attorney, constitute legal malpractice, and violate professional conduct rules, such as the ABA Model Rules of Professional Conduct, including Rule 1.16 regarding unauthorized withdrawal and Rule 8.4 prohibiting dishonesty and fraud. Additionally, it might infringe upon The Plaintiff's due process rights and violate court procedural rules. Rodriguez Rivera met with The Plaintiff and was aware of the case details, making him responsible for the irregularities that occurred under his watch and with his consent.

21. Oficina Legal Comunidad is a non-profit organization based at the Interamerican University of Puerto Rico, Faculty of Law (Facultad de Derecho de la Universidad Interamericana de Puerto Rico), a private institution accredited by the Middle States Association of Colleges and Schools. The organization is supposed to be dedicated to upholding the law and legal standards while handling cases for underprivileged residents. However, it is alleged to have engaged in illegal and unethical activities through its agents, including Rivera, Torres, Martinez Orabona, and Rodriguez Rivera, as well as an intake secretary, whose actions will be detailed later in this complaint. For an organization established to assist disadvantaged residents to be involved in such severe misconduct is deeply disheartening and demands rectification. Additionally, this

organization and its agents are alleged to have conspired with RICO violators and other local pro bono organizations to prevent The Plaintiff from obtaining legal counsel elsewhere.

22. Servicio Legales de Puerto Rico, a local non-profit legal help agency for disadvantaged residents, is alleged to have violated The Plaintiff's right to counsel and due process by conspiring with industry colleagues at Oficina Legal Comunidad and refusing to provide legal representation after initially accepting the case. In April 2023, following Attorney Javier Abraham Torres Rivera's actions that led to a violation of The Plaintiff's rights, The Plaintiff sought new counsel. Despite assurances that the case would be handled, and after several documents were filled out and files created, the attorney suddenly stopped working on the case after discussing it with another lawyer and the director while reviewing Torres Rivera's case filings. Although the attorney promised a response within a couple of days, The Plaintiff only received a call from a non-English speaking secretary, who indicated that a letter explaining the refusal would be sent—but it was never received.

23. Attorney Hadassa Santini Colberg, Executive Director at Servicio Legales de Puerto Rico, is alleged to have failed to provide due process and participated in the RICO scheme orchestrated by Gustavo Higuerey. Under her leadership, the organization committed legal malpractice by reneging on the verbal contract with The Plaintiff, who signed the contract for representation while the organization was working on developing the case, completing the paperwork, and creating files. Despite moving forward with the case, the attorney assigned abruptly stopped working while reading Torres Rivera's filings and agreed with The Plaintiff that the owner of the property might be involved in RICO

schemes. The written notification explaining the refusal to take the case was evaded, despite there being no legal reason to decline. A non-English speaking secretary indicated that a letter would be sent explaining the denial, but the letter was never received. If the organization was concerned about involvement in a case where The Plaintiff faced RICO violations, this concern was not documented in writing. Such documentation would have implicated Higuerey, her colleague Rodriguez Rivera, and Oficina Legal Comunidad, highlighting the lack of transparency and potential collusion in the scheme.

24. Attorney Nilda Muñoz Vissepo represents Gustavo Higuerey and is alleged to have played a central role in orchestrating and implementing violations of The Plaintiff's rights. The Plaintiff accuses Vissepo of legal malpractice, infringing upon civil rights, and participating in fraudulent activities and misrepresentations. Additionally, Vissepo is linked to Inversiones Ferdinando San Juan LLC, a real estate company registered at the same address as Higuerey's hotel. This connection raises significant concerns about conflicts of interest and possible deeper involvement in the alleged scheme. The Plaintiff further contends that Vissepo's actions, including potential racial insensitivity and unethical conduct, demonstrate her willing and conscious participation in Gustavo Higuerey's RICO scheme, contributing to a broader conspiracy that has severely harmed The Plaintiff.

25. Officer Edith Figueroa-Rogue, a police officer at Precinct 466 in Santurce, San Juan, Puerto Rico, played a central role in Gustavo Higuerey's RICO scheme through the abuse of her authority and purposeful dereliction of duty. It is alleged that Figueroa-Rogue intentionally refused to allow The Plaintiff to file a written report on a murder-for-hire plot, seeking to obstruct justice and benefit from the scheme. By purposefully failing to

file the proper complaint, refusing to record critical evidence and delaying the investigation, she not only abused her power but also facilitated Higuerey's illicit activities, ensuring that no official record of the assailants was available and furthering the RICO conspiracy.

26. The Puerto Rico Police Department failed to provide proper oversight and accountability in its handling of The Plaintiff's case. The department neglected its duty by improperly executing an eviction order without due process, including making threats to break into The Plaintiff's home despite the lock having been broken the previous day. Additionally, the department did not ensure proper oversight of Officer Edith Figueroa-Rogue, who mishandled a serious murder-for-hire investigation. This willful neglect of duty and disregard for The Plaintiff's rights exacerbated the harm suffered and contributed to the broader failure of justice.

27. Defendant Leandro Sifuentes Jr., serves as the head of the Puerto Rico Police Department, overseeing the operations and personnel within the department. The Plaintiff alleges that Defendant Sifuentes failed in their duty to provide adequate oversight and supervision, leading to systemic failures and misconduct within the department. These deficiencies resulted in significant harm to The Plaintiff. Despite the absence of a formal complaint due to perceived ineffectiveness of the internal process, The Plaintiff seeks compensatory damages and injunctive relief to address these issues and prevent further harm.

**The facts**

1. In early September 2021, The Plaintiff relocated to an apartment at 327 Calle Bellevue in San Juan, Puerto Rico, marking her first stable residence after several years of transient living while traveling and working remotely. Eager to settle and invest in her business, Little Pearl Education Group, LLC, she personally transported her belongings, including office equipment and personal items, to the second-floor apartment.

At 50 years old, a grandmother, and a former teacher turned educational consultant, The Plaintiff was actively engaged in expanding her business and providing services globally. During her residency in Puerto Rico, she:

- Expanded her professional network both online and in person.
- Conducted a highly successful course, charging $888.88 per student.
- Planned and rescheduled a subsequent course due to an accident and illegal electricity shut-off.
- Created and facilitated workshops and seminars.
- Developed a network of private schools for inner-city families, including drafting a business plan.
- Managed marketing and client communications extensively.
- Launched a new product division within her business.
- Consulted with financial and marketing experts to support her business operations.

These activities underscore The Plaintiff's professional commitments and the disruption caused by the issues at 327 Calle Bellevue, which are central to her claims in this case.

2. The rental agreement was signed with Sabbagh Property Management, LLC and its agent, Maraliz Rivera Ortiz, in the early days of September 2021. Unbeknownst to The Plaintiff,

Rivera Ortiz was representing SM Reparto Metropolitano, LLC and Hyman Mamiye. The Plaintiff agreed to pay $635 per month for one year, which included utilities (electricity and water). However, Rivera Ortiz later asked The Plaintiff to sign a different contract for $575 per month, stating that the water would be included, but the electricity would remain in the owner's name, with The Plaintiff responsible for paying the bill upon receipt. The Plaintiff, though not legally obligated, verbally agreed to these terms. On September 11, 2021, Rivera Ortiz presented The Plaintiff with a blank contract and instructed her to sign it. Alarmed by the request, The Plaintiff refused, at which point Rivera Ortiz filled in the contract and asked The Plaintiff to review, sign it, and place it in the mailbox for later pickup. The Plaintiff complied, but upon reviewing the contract, she noticed there was no mention of the arrangement regarding the electricity bill.

3. On the same day, Rivera Ortiz delivered a stove and refrigerator to The Plaintiff's apartment, warning her that the stairs were slippery. She instructed The Plaintiff to buy slip-resistant strips and to install on the steps and promised reimbursement. Confused by the request, The Plaintiff thought perhaps Puerto Rican standards are different. After Rivera Ortiz left, The Plaintiff attempted to lock the downstairs gate but slipped on the unsafe steps, falling down an entire flight. Unable to get up immediately, The Plaintiff struggled to reach the second floor and informed Rivera Ortiz about the fall via text.

4. The Plaintiff sought medical attention for severe pain and difficulty moving and walking. Bruising was documented, medication was administered, and physical therapy was prescribed. The Plaintiff was unable to perform her daily routine or take on clients due to her injuries. She requested the property insurance information from Rivera Ortiz, who initially provided it. However, Rivera Ortiz refused to cooperate with the insurance

process and instead began harassing The Plaintiff for rent, even threatening to illegally cut off utilities. Rivera Ortiz told The Plaintiff that nothing stops a tenant from paying rent.

5. At the end of September 2021, The Plaintiff could barely walk, was unable to sit for extended periods, and was running out of funds due to the necessity of ordering food every day (as the stove and refrigerator had not yet been installed). She relied on Uber for transportation to physical therapy and Walgreens for COVID tests to meet the hospital's COVID mandates. Even the rides in cars was painful. Although she had always loved animals and had never before needed to ask others for assistance with a pet, she recognized she could not afford to care for Bruno. Despite feeling it was beneath her to seek help, she believed the dog, a street darling, deserved a better life. In response, she set up a GoFundMe campaign to seek help for the dog's care. The Plaintiff received numerous packages, which included months' worth of dog food. Additionally, a friend provided her with a voucher for veterinary services. The friend helped The Plaintiff pick ticks off Bruno and even that became unbearable and The Plaintiff had to abort the mission.

6. The Plaintiff had to return to the hospital several times due to pain.

7. The lights were illegally disconnected in December 2021.

8. The Plaintiff applied for legal assistance at the offices of Oficina Legal Comunidad. She was greeted by a sign on the file cabinet in the secretary's office, stating that they only speak Spanish. The Plaintiff completed the intake form to seek legal help in addressing the illegal disconnection of electricity, but despite waiting, she never received any follow-up or next steps from the office.

9.  As The Plaintiff continued to seek medical help and heal, all possibilities of work were extinguished due to Rivera Ortiz's actions under the guise of SM Reparto Metropolitano, LLC and Hyman Mamiye. Their conduct constituted as **harassment, breach of contract, constructive eviction**, and **retaliation**—each of which marks the beginning of their RICO violations, severely impacting The Plaintiff's livelihood and wellbeing.

10. The Plaintiff sought ways to charge her phone for safety reasons and to maintain communication with clients, including canceling sessions. Over a two-year period, she found herself struggling to secure electrical connectivity necessary for work and survival. She relied on various sources, such as restaurants, hotels, colmados, and makeshift sockets created by others. This even included seeking electricity in a crack den where locals congregated to smoke crack, shoot heroin, and engage in similar activities.

11. Though The Plaintiff is not a drug user, she was welcomed by the individuals in these spaces. They offered her food, inquired about her work, and requested her services, which she provided for donations instead of her usual fees of $44.44, $88.88, and $111.11. The conditions of these spaces deteriorated the aesthetics her clientele was accustomed to, leading to a decline in her brand's reputation.

12. On January 6, 2022, the alleged RICO enterprise sent agent, Janu, to the property at 327 Calle Bellevue, unannounced. Janu yelled The Plaintiff's name from the street, prompting The Plaintiff to meet with her. Janu demanded rent. The Plaintiff explained the fall, her injuries, and her inability to work due to the disconnection of the lights. Janu responded that nothing prevents a tenant from paying rent. The Plaintiff reiterated her rights, and Janu stated she would speak to management and get back to The Plaintiff. However, she never did and ignored The Plaintiff's subsequent attempts to resolve the matter.

13. On approximately January 31, 2022, The Plaintiff was contacted by Deborah Camejo, who ambiguously introduced herself as a representative of the new owner of 327 Calle Bellevue. It was later discovered that Camejo was an employee at La Terraza de San Juan, a hotel associated with Gustavo Higuerey, raising uncertainties about both her role and the new owner's identity. Camejo indicated that Rivera Ortiz had instructed her to inquire about back rent, despite the fact that the new owner, represented by Higuerey's entity, had no legal claim to such payments before their acquisition of the property. Higuerey, as an officer of the entity that is the new owner, later sought back rent from October 2022, even though the purchase of the property was completed in January 2023. This discrepancy suggests collusion between Higuerey, Rivera Ortiz, and other interrelated entities such as SM Reparto Metropolitano, LLC, Ultimate Realty, LLC, and MCM Equities, LLC. Their actions—failing to send the promised welcome letter, ignoring legal obligations, and pursuing back rent—demonstrate a deliberate intent to cause harm rather than simply exercising legal rights. Under Puerto Rican law, specifically Act No. 104 of June 18, 1976 (Ley de Arrendamientos Urbanos), new landlords can terminate existing leases and evict tenants, yet Higuerey and his associates chose to act with malintent, disregarding legal and ethical standards to inflict additional harm on The Plaintiff.

14. In late February - May 2022, The Plaintiff had sporadic falls. No trips. No dizziness. Just lossed control of leg functions without warning and falls to the ground.

15. On or about March 14, 2022, Gustavo Higuerey allegedly turned off the water supply at 327 Calle Bellevue, compelling The Plaintiff to use water from an outside spigot for daily needs. The Plaintiff was forced to wash clothes in the street and, due to the lack of

running water, had to use the water from the spigot to flush the toilet and shower. This situation resulted in the toilet and shower becoming backed up. Consequently, The Plaintiff had to take showers on the open balcony during the night or early morning and resorted to using cups, bags, and newspaper for urination and defecation.

16. The Plaintiff returned to Oficina Legal Comunidad seeking legal assistance and encountered the same receptionist who had previously handled her case. The receptionist was dismissive and requested that The Plaintiff leave and return another day, citing that the attorneys were busy. The Plaintiff, facing a dire situation and having heard nothing from the office since December, chose to remain in the lobby. While waiting, Javier Torres Rivera appeared in the lobby and handed a manila envelope to two potential clients. The Plaintiff asked him for help, and he retrieved her file, stating that it was closed due to the office's inability to contact her, despite having her address and email. Javier Torres Rivera showed The Plaintiff a phone number written by the receptionist, which was incorrect. The Plaintiff suspects this was done deliberately by the receptionist. Torres Rivera then reopened the case.

17. On March 18, 2024, The Plaintiff received an eviction notice from Liquidators Warehouse, LLC, a company registered to Rebecca Cotto with Gustavo Higuerey listed as a member. The typewritten letter, which will be submitted as evidence, did not provide a phone number or contact person and claimed that The Plaintiff must vacate the property due to a breach of contract related to non-payment. The eviction notice did not allow for due process, as it failed to adhere to legal requirements for notification and tenant rights.

18. Javier Torres Rivera contacted Rivera Ortiz, who confirmed that the house at 327 Calle Bellevue had been sold but she refused to disclose the identity of the new owner.

19. The Plaintiff conducted research related to the legal matters concerning Liquidator's Ware House, LLC and provided this information to attorneys Javier Torres Rivera and Annette Martinez Orabona so they could make contact regarding the case.

20. On March 29, 2024, The Plaintiff was illegally locked out of her apartment. Gustavo Higuerey called The Plaintiff, introducing himself for the first time. The Plaintiff, who knew Higuerey's identity from her research of Liquidators Warehouse LLC, was informed by Higuerey that the lockout was due to the eviction notice. She explained the impact his actions had on her, pointed out that he had no way of knowing if she was inside the apartment, and asserted that his actions were illegal and dangerous. Higuerey demanded that The Plaintiff pay the rent immediately. The Plaintiff requested payment information, as she had been approved for Covid Renta, a rent support program, and was also waiting for insurance assistance. During the call, The Plaintiff's phone died. The Plaintiff never received payment information, while other tenants, who are of Latino origin and not of African American descent (distinct from Afro-Latino or Black Latino), did receive it. This discrepancy underscores The Plaintiff's concern that the failure to provide payment information was part of a discriminatory practice based on racial and ethnic differences.

21. On April 7, 2022, The Plaintiff was locked inside her residence, prompting emergency services—including fire, police, and ambulance—to forcibly break into the property to rescue her. She was subsequently taken to a medical facility, where she was treated for an anxiety attack, a condition she had no prior history of. The situation was further aggravated by a previously discovered gas leak and the absence of water in the residence. These hazardous conditions, combined with being trapped inside the apartment, created a

dangerous and life-threatening situation. This incident is particularly egregious considering that Gustavo Higuerey had been warned about these dangers a week prior. His blatant disregard for the warnings and The Plaintiff's safety demonstrates a severe level of malicious intent and gross negligence. By ignoring the serious risks and failing to address them, Higuerey displayed a deliberate indifference to The Plaintiff's well-being, underscoring a shocking level of malicious intent in his actions.

22. After the incident, The Plaintiff received a call from an unregistered phone number. When she attempted to return the call, she received a message indicating that the number could not receive calls. The Plaintiff believes that this call is consistent with previous behavior of a member of the RICO organization involved in her case.

23. Javier Torres Rivera and Annette Martinez Orabona contacted The Plaintiff, informing her that they intended to drop the case because they could not get in touch with anyone representing the new owner. The Plaintiff clarified that the contact information for the new owner was a hotel in Old San Juan, which operates 24/7 and can receive service of papers. Troubled by the fact that this obvious and critical detail was ignored by not one, but two attorneys, The Plaintiff felt compelled to protect the integrity of her case. She followed up by providing this information in writing via email. This disregard for essential contact details, coupled with the attorneys' decision to drop the case, raises serious concerns about potential collusion and a deliberate attempt to deny The Plaintiff due process, further suggesting a conspiracy to undermine her legal efforts.

24. Within days of The Plaintiff suggesting the use of the existing contact information for the new owner, Javier Torres Rivera and Annette Martinez Orabona informed her that they had contacted Deborah Camejo, who was revealed to be a secretary. Despite this contact,

no injunctions were filed or served on The Plaintiff's behalf as originally agreed upon. The Plaintiff's need to document the attorneys' intention to drop the case was confirmed, as their inaction and failure to act on The Plaintiff's case raised serious concerns about the integrity of their representation.

25. Further investigation revealed that Deborah Camejo, who had introduced herself to The Plaintiff as a representative of the new owner, is actually the General Manager of the hotel, according to her LinkedIn profile. Although Camejo never identified herself as a secretary directly to The Plaintiff, Javier Torres Rivera and Annette Martinez Orabona later informed The Plaintiff that Camejo was merely Higuerey's secretary. This mismatch between Camejo's true role as General Manager and the representation given by the attorneys highlights a deliberate attempt to mislead and obscure the true nature of her position. This misleading information adds to the pattern of deception and evasiveness surrounding the ownership transfer and the handling of The Plaintiff's case, raising serious concerns about the integrity and transparency of the entire process.

26. Further investigation revealed that Deborah Camejo, who had introduced herself to The Plaintiff as a representative of the new owner, is actually the General Manager of the hotel, according to her LinkedIn profile. Although Camejo never identified herself as a secretary directly to The Plaintiff, Javier Torres Rivera and Annette Martinez Orabona later informed The Plaintiff that Camejo was merely Higuerey's secretary. This mismatch between Camejo's true role as General Manager and the representation given by the attorneys highlights a deliberate attempt to mislead and obscure the true nature of her position. This misleading information, coupled with her significant role in the RICO scheme, further implicates La Terraza de San Juan Hotel, LLC. It underscores a broader

pattern of deception and evasiveness surrounding the ownership transfer and the handling of The Plaintiff's case, raising serious concerns about the integrity and transparency of the entire process, and demonstrating a blatant disregard for due process and fairness.

27. On April 18, 2022, The Plaintiff went to the First Instance Court of San Juan to request a restraining order to address the abuse of power and harassment, following the advice of her lawyer, Javier Torres Rivera, who instructed her to obtain a police report. The Plaintiff followed the police's instructions at Precinct 466, where she was informed that the matter was not criminal but civil and was directed to the courts. At the court, The Plaintiff filed an order of protection to stop the harassment. Upon returning home around 10 PM, she found that she was locked out of her residence, as everything was closed. This left The Plaintiff exposed to the elements, at the mercy of strangers, and vulnerable in a high-crime area, further compounding the distress and danger she faced.

28. On  April 27,  2022, The Plaintiff appeared at court for a scheduled hearing but was informed that the hearing was canceled due to COVID-19, despite the court being busy with other cases. The Plaintiff notified the marshals of the seriousness of the matter, and they instructed her to submit another request to have the case heard that day. The Plaintiff complied with this instruction. Subsequently, the judge called Gustavo Higuerey and Attorney Nilda Muñoz Vissepo back to the court.

29. During the hearing, The Plaintiff introduced herself to the court for the first time, which was also the first time she met Gustavo Higuerey and his attorney. She described herself as a 53-year-old grandmother, an educator with her own business, and holder of a master's degree. The Plaintiff explained that she had been traveling extensively, staying in hotels and Airbnbs with excellent ratings and reviews. She moved to Puerto Rico in

March 2021, initially living in a hotel for three months before relocating to 327 Calle

Bellevue. She also expressed her concerns about the harassment and dangers she had

experienced at the hands of Higuerey and his associates.

30. During court proceedings, Gustavo Higuerey made several statements regarding The

Plaintiff's situation. He asserted that the racialized stereotype of The Plaintiff being lazy

and wanting to live for free, ignoring her introduction and the reality of who she is,

reduced her to a conjured stereotype. He also questioned how The Plaintiff could expect

to have utilities if she was not paying for them, despite it being the law. This reflects a

blatant disregard for legal obligations and a malicious intent to undermine and harm The

Plaintiff's credibility. Higuerey further claimed that he did not turn off the water with the

water authority, suggesting instead that he personally turned off the water supply at the

house, revealing a disregard for The Plaintiff's well-being and demonstrating his intent to

cause her further distress. Additionally, Attorney Nilda Muñoz Vissepo's involvement in

this case has also been marked by similar malicious intent and disregard for The

Plaintiff's rights, exacerbating the harm inflicted and contributing to the overall pattern of

abuse and negligence.

31. Furthermore, Attorneys Muñoz Vissepo and Higuerey tried to deceive the court by

submitting an altered copy of the eviction letter into evidence, in direct response to The

Plaintiff's complaint about the lack of contact information. The original letter, which will

be submitted into evidence later, claims that The Plaintiff is in breach of contract. This

contradiction directly disputes their assertion that The Plaintiff refused to sign a new

lease. How can The Plaintiff be in breach of a contract they stated she never signed? It

also confirms their acknowledgment of the contract The Plaintiff signed with Sabbagh

Property Management and Rivera Ortiz as the only valid contract that can be referenced.

32. Also, Higuerey asserted to the judge that the rent is $575 per month, which is another

sign of collusion. The Plaintiff's contractual agreement was $635, including water and

electricity. The original owner wanted The Plaintiff to agree to $575 with only water. For

a new owner to assert the exact same amount and conditions is odd in the context of the

other evidence. This consistency suggests collusion.

33. Higuerey's detailed knowledge about The Plaintiff's prior lease and insurance claim is

highly suspicious and suggests collusion. He informed the court that The Plaintiff had

sued the previous landlord, lost the suit, and did not receive support from the insurance

claim. This complete fabrication—claiming that The Plaintiff filed and lost a

lawsuit—indicates a deeper fear of the alleged RICO organization, especially given that

The Plaintiff had previously stated in writing that she was not seeking to sue but merely

needed support for her healing process. Additionally, The Plaintiff had not received any

communication regarding the outcome of her insurance claim. The fact that the new

owner had access to this information further underscores the extent of collusion and

manipulation within this case.

34. Under Muñoz's counsel, Higuerey perjured himself by claiming that he was owed back

rent up to October 2021, asserting that this was the agreement between him and the

previous owner. This claim is not legally supported and is not legally possible, as there

was no legal transfer of rights to collect back rent under Puerto Rico law. Moreover,

Muñoz would assert this baseless claim again in another court proceeding, further

demonstrating her incompetence in leading her client down an honest, legal path and her

complacency and participation in a broader RICO scheme. This pattern of deceit and illegal actions reveals a deliberate effort to manipulate the legal process and undermine The Plaintiff's rights.

35. The judge ruled that the case should be transferred to another court, stating that The Plaintiff needed legal representation.

36. The fact that Javier Abraham Rivera Torres illegitimately sent The Plaintiff on a wild goose chase, directing her to the police, only for the police to send her to the court, and then the court telling her she was in the wrong jurisdiction and needed to get a lawyer, demonstrates the complete lack of due diligence from Oficina Legal Comunidad, Rafael Rodríguez Rivera, Annette Martinez Orabona, and Javier Abraham Rivera Torres. This misdirection not only reflects their failure to properly advise and represent The Plaintiff, but it also resulted in personal endangerment, prolonged her status as indigent, and forced her to continue living in squalor. Their actions contributed to the denial of her rights, safety, and basic dignity, amplifying the injustice and their part in a broader RICO scheme, further entrenching the corruption that has perpetuated these injustices.

37. In May 2022, The Plaintiff began showering outside under the cover of night in a back alleyway between homes, using an outdoor water spigot at a neighbor's house. Though always in danger of being caught, this method proved far more refreshing than attempting to clean herself with just one gallon of water on her balcony.

38. Prior to this, The Plaintiff had begun to experience severe itching, and when she scratched, her fingernails became filled with dirt from her body. During her first outdoor shower, it took her seven washes and rinses to finally cleanse the accumulated grime from her skin.

39. In July 2022, The Plaintiff sent a Cease and Desist letter to known members of the alleged RICO organization, seeking proactive relief from their actions in lieu of the inaction of Javier Abraham Rivera Torres and Annette Martinez Orabona to assert and protect her legal rights. This letter was sent to La Terraza de San Juan Hotel and was signed for, but the actions continued and worsened, further demonstrating The Plaintiff's vulnerability and the defendants' persistent disregard for her rights.

40. In August 2022, shortly after The Plaintiff asserted her rights by sending a Cease and Desist letter to known members of the alleged RICO organization, Higuerey and Muñoz Vissepo filed an official eviction claim against The Plaintiff, citing non-payment. The suspicious timing of this claim, along with the use of Liquidators Warehouse, LLC, strongly indicates that it was retaliatory, further demonstrating the ongoing efforts of the organization to undermine The Plaintiff's legal standing and escalate their coercive actions

41. During the serving of the eviction papers to The Plaintiff, Attorney Nilda Muñoz Vissepo submitted information to the court regarding The Plaintiff's alleged religious practices. This information was inconsequential to the eviction or any part of the legal process and directly violated The Plaintiff's First Amendment rights. The process server, who was hired by Muñoz, was informed by a neighbor about The Plaintiff's alleged religious practices. This unverifiable and nonconsequential attempt to prejudice the court by introducing irrelevant personal details underscores the malicious intent behind the eviction claim and highlights the broader pattern of unfair treatment and procedural manipulation employed against The Plaintiff.

42. The Plaintiff sufferers from urinary tract infections, bacterial vaginosis, severe constipation, the inability to control bowels and urinary incontienence. She went to the emergency room for the constipation and was reduced to defacating on the floor while standing due to the pain. Medical recods show the prolonged change in diet due to poverty and and eating condition brought this on. The fecal incontinence has been link to the drastic prolonged change in diet and her pancreas was damaged, stopped making the enzymes to break down foods. The UTI's started to regulate, once she had regular access to a bathroom shower. Medical records will be submitted.

43. The water supply was returned while men were working at the residence with Juan Fri. The Plaintiff believes this was an attempt to appear more upstanding in court. However, The Plaintiff had already been without water for 5-6 months. In addition, men had been working around the house for several months, and the failure to turn the water on during those numerous occasions further demonstrates ill intent.

44. Almost two years to the month after the incident, in August 2023, The Plaintiff finally began physical therapy for the injuries associated with her fall, as prescribed by her doctor. This came after a prolonged battle with the insurance bureaucracy to get the necessary approval for treatment. The delays in receiving proper medical care contributed to the prolonged recovery process, further affecting her ability to work and maintain her business.

45. Just a day or less before the October 2022 eviction hearing, The Plaintiff asked Javier for proof of sale of the property at 327 Calle Bellevue. This request underscores a lack of due diligence once again. Given the vital and basic nature of this information, its omission until such a late stage suggests that Rivera Torres, Martínez Orabona, and Rodríguez

Rivera may have been complicit in conspiring with the alleged RICO scheme, potentially intending for the case to be jeopardized.

46. Additionally, prior to the October 2022 eviction hearing, Rivera Torres advised The Plaintiff to prepare for moving. This premature advice further illustrates the disregard for due process and indicates a possible intent to undermine The Plaintiff's position in the ongoing legal battle. This is especially troubling since the eviction case was based on an alleged lack of payment, yet no proof of payment or instructions had ever been given to The Plaintiff. The was a complete resignation to injustice and unwillingness to fight for one's client.

47. During the October 2022 eviction hearing, Munoz Vissepo and Higuerey doubled down on their statement that The Plaintiff does not work with no documented proof of where that notion derives.

48. No objection was lodged by Attorney Javier Rivera Torres during the hearing, despite The Plaintiff's complaints about the hurtfulness of the biases, which were voiced both verbally and in writing. Furthermore, The Plaintiff had explicitly asked members of the alleged RICO scheme to cease racial stereotyping in the cease and desist letter, highlighting the purposeful violations and the ongoing pattern of discriminatory and unethical conduct. This inaction underscores Torres's participation in the RICO schematics and his complicity in the ongoing misconduct.

49. In court, in response to The Plaintiff's inability to make payments due to the deliberate withholding of payment information, Muñoz and Higuerey asserted that The Plaintiff always had access to this information. They argued that she could have used the original payment method, a Popular Bank account associated with co-defendants Sabbagh

Property Management, LLC, Maraliz Rivera Ortiz, SM Reparto Metropolitano, LLC (Puerto Rico), SM Reparto Metropolitano, LLC (New York), Hyman Mamiye, MCM Equities, LLC, Chuck Mamiye, Ultimate Realty, LLC, and Joe Sabbagh. This situation reveals the sale of the home as a fraudulent real estate transaction, with payments intended for the new owner actually being redirected from the previous owner, thereby validating collusion and money laundering. This conduct exemplifies fraudulent misrepresentation, financial deceit, and concealment of information. It also suggests serious violations such as financial fraud, breach of fiduciary duty, and conspiracy, all within a highly elaborate and sophisticated RICO schematic designed to obscure the true nature of the transactions and evade accountability.

50. The court ruled in The Plaintiff's favor, determining that the accused RICO actor, Liquidators Warehouse, LLC, had no authority to pursue the lawsuit. This critical argument was notably absent from the representations made by Rivera Torres, Martinez Orabona, Rodriguez Rivera, and Oficina Legal Comunidad, demonstrating a failure on their part to adequately defend The Plaintiff's interests. Their inaction suggests an attempt to jeopardize the case in favor of their alleged RICO counterparts.

51. On November 14, 2022, The Plaintiff filed a civil damages suit in the Tribunal de Primera Instancia against Higuerey and other implicated RICO actors. Despite her reluctance to pursue legal action due to her personal beliefs against suing, the aggressive and relentless nature of the attacks against her left her with no other option. On November 21, 2022, Gustavo Higuerey was served with the complaint, with Deborah Camejo signing the service papers. This action underscores her commitment to holding the defendants accountable and seeking redress for the injustices she has endured.

52. The Plaintiff feared for her life, as documented in multiple instances with therapists. She experienced severe harassment, including being followed around town by unidentified individuals, which contributed to her profound sense of insecurity. This fear was further reflected in her documented nightmares, where she reported anxieties about someone entering her home to cause harm. To mitigate these threats, she took extensive precautions, such as varying her routes and avoiding frequenting the same locations. Additionally, she closed all doors and windows at night despite having no electricity due to the defendants' illegal shutoff and her financial constraints, which were created by the defendants' schematics. These measures highlight the intense and pervasive fear she endured, adding weight to the claim of ongoing harassment and potential collusion.

53. In December 2022, The Plaintiff discovered the initiation of a new eviction case. This time, the accused RICO actors, Higuerey and Muñoz Vissepo, used 327 Bellevue, LLC as the litigant. The Plaintiff's request for a bill of sale revealed that 327 Bellevue, LLC was the actual owner of the property, not Higuerey or Liquidator's Warehouse, LLC. The courthouse and The Plaintiff's actions forced this crucial information to light, ensuring that the correct RICO participants were accurately documented and held accountable. This development underscores the ongoing manipulation and deceit employed by the defendants to evade responsibility and mislead the court.

54. Judge Valerie Cintrón Concepción was the presiding judge in the new court case. During various hearings from February 2023 to April 2023, Cintrón Concepción refused to allow the use of the appointed English translator, violating The Plaintiff's right to a fair trial and equal access to court proceedings. She disallowed The Plaintiff access to and attendance at virtual hearings after The Plaintiff was improperly removed, infringing upon her rights

to participate in her own legal defense and undermining the integrity of the judicial

process. Additionally, Cintrón Concepción permitted racially charged stereotypes to be

introduced into her courtroom, further compromising the fairness of the proceedings and

perpetuating discriminatory practices. The Plaintiff believes that the accused RICO actors

did not want a replay of the October hearing because The Plaintiff's defense was strong,

and therefore needed to incorporate the judge into their scheme. This abuse of power,

committed under the color of law, effectively surrendered her judicial immunity and

contributed to the broader RICO scheme, ensuring The Plaintiff's rights were

systematically undermined.

55. Attorney Javier Rivera Torres failed to take any action to address or rectify the numerous

violations and injustices occurring throughout the legal proceedings. Despite being aware

of The Plaintiff's documented issues, including the denial of access to English translation

services, exclusion from virtual hearings, and the introduction of racially charged

stereotypes, Rivera Torres did not intervene or seek to correct these procedural breaches.

His inaction and lack of support not only compounded The Plaintiff's difficulties but also

demonstrated a disregard for his duty to protect his client's rights. Rivera Torres's failure

to challenge these violations or advocate for fair treatment highlights his negligence and

complicity in the broader scheme of misconduct orchestrated by the accused RICO

actors.

56. During a hearing, Higuerey began his testimony by instructing the judge not to heed The

Plaintiff's statements, suggesting instead that she should use her eloquence to find

employment. This remark blatantly disregarded the cease and desist order and prejudiced

the court by introducing irrelevant personal opinions. Rivera Torres failed to object to this

discriminatory commentary, compounding the violation and demonstrating a disregard for The Plaintiff's rights. Additionally, Judge Valerie Cintrón Concepción, who was supposed to ensure fair proceedings, allowed this biased statement to go unchallenged, thereby endorsing the racial bias evident in the courtroom. This collective failure not only undermined The Plaintiff's position but also highlighted a broader pattern of judicial and legal misconduct orchestrated by the accused RICO actors.

57. Judge Valerie Cintrón Concepción ordered that the final eviction hearing be held in isolation, on a day when no other cases or courtrooms were in session and without any witnesses present. This order violated The Plaintiff's right to a fair and public hearing, a fundamental aspect of due process. Additionally, this isolated setting prevented any potential scrutiny or oversight of the proceedings, further compromising the integrity of the case. Rivera Torres did not object to this unusual and prejudicial arrangement, failing to challenge the venue or protect The Plaintiff's rights. This inaction, coupled with Cintrón Concepción's decision, highlights a pattern of procedural violations and potential complicity with the accused RICO actors, including Higuerey, Muñoz Vissepo, and others, contributing to the ongoing injustice against The Plaintiff.

58. In preparation for the hearing, The Plaintiff met with Rivera Torres and Martinez Orabona at the offices of Oficina Legal Comunidad. Upon arrival, The Plaintiff was greeted by a sticker stating "Decolonize This Space." Coupled with the organization's stated preference for Spanish speakers and their previous attempts to close The Plaintiff's case twice, The Plaintiff felt that the sticker was a direct reflection of her treatment, regardless of the campaign's intent. This impression was reinforced by the lack of due diligence and the differential treatment she experienced. The Plaintiff perceived this as

part of a broader pattern of discrimination against her as an accomplished African American woman, relegated to stereotypes of being lazy, non-working, and undeserving of equal protection under Puerto Rican and federal laws. The actions and attitudes of the lawyers and the organization contributed to this unjust and unequal treatment.

59. In the meeting, The Plaintiff asked Rivera Torres to object when Higuerey and or Munoz Vissepo used the racially charged defense. He agreed.

60. The Plaintiff argued that the case was contestable because it involved a lack of payment, and no established payment instructions had been provided, making the central claim defendable. Additionally, The Plaintiff had secured payment via COVID rent relief but needed the landlord's payment information to access the funds. Attorney Martinez Orabona asserted that the judge would rule that "Puerto Rico is a summary state and she is not going to hear arguments outside of occupancy, dates, and whether The Plaintiff paid." This assertion was puzzling, especially since a previous eviction case had included full arguments in a similar summary state. The Plaintiff found this eerily collusive, raising concerns about how Martinez Orabona could predict Judge Cintrón Concepción's ruling with such certainty and suggesting possible bias or undue influence in the proceedings.

61. The Plaintiff submitted evidence to Rivera Torres regarding the corporate shell game and asked him to submit it. He refused and quit the case the night before the hearing and did not give The Plaintiff information to attend the hearing.

62. On the day of what was to be the final hearing, Judge Cintrón Concepción held a sidebar with counselors Rivera Torres and Muñoz Vissepo, without announcing the reason for the sidebar before or after the meeting. During this sidebar, Muñoz Vissepo and Rivera

Torres were observed being unusually cozy and familiar, whispering in each other's ears. Cintrón Concepción did not inquire whether The Plaintiff had another lawyer, if she wished for Rivera Torres to continue representing her, or seek any key insights from The Plaintiff to ensure that due process was properly followed. This lack of procedural transparency and disregard for The Plaintiff's representation and input further exacerbated concerns about the fairness of the proceedings.

63. Without warning, Judge Cintrón Concepción split the case into two parts: the eviction and the financial matters. On the day of the hearing in the secluded venue, she addressed only the summary issues related to occupancy, dates, and whether The Plaintiff had paid or not. This approach mirrored exactly what Attorney Martínez Orabona had previously revealed, and the judge's words were verbatim, suggesting a troubling alignment and potential collusion. Cintrón Concepción refused to hear any arguments related to payments, which are central to a nonpayment eviction case. Additionally, she silenced The Plaintiff, prohibiting her from speaking directly and allowing communication only through Rivera Torres, who had resigned the night before and refused to submit evidence to the record. Rivera Torres did not speak on The Plaintiff's behalf, effectively leaving The Plaintiff secluded and silenced. These actions constitute a violation of due process by unexpectedly splitting the case and restricting The Plaintiff's ability to address all issues fairly, suggest collusion and prejudice due to the alignment with Martínez Orabona's statements, and represent a failure to ensure proper representation and fair treatment by prohibiting The Plaintiff from speaking directly and allowing inadequate legal representation.

64. In the final hearing, Higuerey and Muñoz Vissepo notably refrained from employing their racially charged defense, a stark departure from their previous tactics. This strategic shift occurred after The Plaintiff explicitly requested that Rivera Torres object to their prejudiced arguments. The omission of such defenses in this critical moment not only underscores the orchestrated nature of the legal maneuvering but also reveals a deeper scheme of racketeering. The deliberate choice to withhold racially biased arguments at a pivotal point in the proceedings points to an intricate and coordinated effort among the accused RICO actors to manipulate the case in their favor while evading accountability for their unethical practices. This calculated adjustment in their defense strategy further highlights the sophisticated nature of their racketeering activities and the deliberate attempt to undermine The Plaintiff's ability to receive fair and unbiased judicial consideration.

65. Judge Cintrón Concepción ordered The Plaintiff to secure new counsel within one week, explicitly denying her request to represent herself. The judge imposed a specific deadline for The Plaintiff to return to court with a new lawyer. In a state of panic, The Plaintiff showed up to court on the appointed date, only to discover that the judge had ambiguously intended for The Plaintiff to file information about the new lawyer, rather than simply presenting the lawyer in court. This lack of clarity and failure to communicate the exact requirements left The Plaintiff in a distressing situation. Despite having filed the necessary paperwork to comply with the order, the confusion and frustration caused by the judge's ambiguous instructions and unreasonable time constraints further exemplify the undermining of The Plaintiff's right to a fair and transparent legal process.

66. In response to Judge Cintrón Concepción's order, The Plaintiff actively searched for new legal counsel. In May 2023, the case was initially accepted by Servicio de Legales de Puerto Rico through a telephone intake, with a staffer promising that they would take on the case. The Plaintiff subsequently met with a female attorney at their Río Piedras office, where she signed a contract for representation. The Plaintiff observed as the attorney created files for the new case, reviewed the case materials, and discussed the case, including the filings from Rivera Torres. However, the attorney abruptly stopped and informed The Plaintiff that she did not handle such types of cases. She mentioned that she would consult with her colleague and the director regarding the matter and promised to call The Plaintiff once a decision had been made.

67. The Plaintiff received notice that Cintron Concepcion ruled for The Plaintiff.

68. The Plaintiff lodged formal complaints with the Supreme Court of Puerto Rico against Attorney Javier Abraham Rivera Torres and Judge Valerie Cintrón Concepción, asserting egregious misconduct and systemic violations of legal ethics. These complaints outline serious allegations, including collusion, denial of due process, and racially biased actions, all of which compromised the integrity of the legal proceedings and violated The Plaintiff's fundamental rights.

69. In the final days, The Plaintiff filed an appeal with the Appellate Court of Puerto Rico, using only her cell phone as the sole operational tool. This underscores the extreme conditions under which she had to navigate the legal system, highlighting her resourcefulness and determination in pursuing justice despite significant obstacles.

70. On or about August 11, 2023, Miguel A. Pabon, Jr., without word or reason took the extension card that went from his apartment to The Plaintiff's.  Previously, he had offered

support so that she did not have to charge her phone outside. On or about the August 12, 2023, The Plaintiff charged her phone downstairs on the porch of neighbor at 327 Calle Bellevue. The Plaintiff saw Miguel A. Pabon, Jr. watching her. She returned to her apartment. Within 5 minutes, The Plaintiff witnessed and overheard Miguel A. Pabon Quinones, Sr. and Miguel A. Pabon, Jr. call the neighbor to her door and tell her no to allow The Plaintiff to charge the phone. When The Plaintiff returned later that day to charge her phone, the neighbor stated that there was a water leak so she unplugged it. Within an hour, another item was plugged into the same socket.

71. On August 14, 2023, in the wee hours of morning, approximately 2:30 AM, The Plaintiff was awake. Her dog was on unusual high alert, lying between The Plaintiff's makeshift bed and the front door, which he had never done before. The Plaintiff hears the rattling of her lock and chains. Armed with her phone, The Plaintiff opened her loud metal balcony door and two men took off on a motorcycle.

72. In fear of her life, The Plaintiff filed a complaint with the local FBI office on August 15, 2023. The intake agent advised The Plaintiff to also involve the local authorities although they can be problematic. The Plaintiff did not return home but begged for safe harbor elsewhere for the night. She also researched added security measures.

73. On August 16, 2023, The Plaintiff reported a murder for hire at Precinct 466 in San Juan with Officer Edith Figeroa Rogue taking the information.

74. On or about August 18, 2023, The Plaintiff saw one of the assailants standing in front of her gate. He was arguing with his girlfriend, the downstairs neighbor, about my lock (it was newly placed there prior to the 14th). The Plaintiff listened to them from her balcony.

75. The Plaintiff returned to Precinct 466 with pictures and positive identification of the assailant and was informed that Officer Figueroa Placa was off for a few days, return when she returns to work. The Plaintiff did as instructed.  Upon returning, they tried to find me in the system and the wrong information was inputted. FIgueroa Rogue changed it on the spot. The Plaintiff asked to fill out a written report and was offered scrap paper to write on.   Figueroa argued that I never said anything about a murder for hire while claiming not to speak english.  The Plaintiff knows some Spanish and heard the translating officer mention murder-for-hire her correct birthdate.. FIgueroa refused to question the identified assailant stating that he might get mad.  She requested that The Plaintiff ask him for his name and relevant information.

76. The attempt on The Plaintiff's life coincides with the day Judge Cintrón Concepción signed the final eviction papers on August 14, 2022. This timing reveals a calculated conspiracy: by finalizing the eviction, the accused RICO actors secured the property—a key asset in their orchestrated scheme. On the flip side, they knew that by evicting her, The Plaintiff would no longer be under their direct control and could escape their diabolical influence, turning into a significant threat via her civil suit and Supreme Court complaints. The signing of these papers was not only essential to ensure her removal from the property but was, in effect, Cintrón Concepción's simultaneous signing of The Plaintiff's death warrant. This timeline underscores the malicious intent and coordination of the RICO scheme.

77. The violation of due process and the absurdity of the situation become glaringly evident when considering the vast number of RICO actors involved against a single, vulnerable grandmother and teacher who has committed no crime or offense. She merely fell down a

flight of steps and, in doing so, agitated a group of narcissistic RICO fanatics who are a danger to democracy, civility, and the rights and freedoms so many Puerto Ricans fought and died for. The blatant disregard for her rights and the calculated nature of these actions reflect a deep-seated abuse of power and systemic corruption, designed to neutralize her opposition and evade accountability. This is a disgrace to the ancestors of the island who sought and sacrificed for freedom and fairness. The Plaintiff identifies with and stands firmly alongside their legacy. She seeks justice not only for herself but as a reminder to all that complacency is never an option.

78. On September 13, 2023 The Plaintiff returned to her home to find the only lock on the property cut with the chain dangling. Horrified and scared, she called the police.

79. On September 14, 2023, Puerto RIco Police came to The Plaintiff's residence to execute eviction orders without proof of service. The officer called the court and spoke with Yomaris Fajardo. She did not provide proof of service but maintained The Plaintiff had to vacate the premises. She also tried to argued that The Plaintiff only had one bedroom and attempted to give her less time to move and stated that she would have the animal control pick up The Plaintiff's dog and put him to sleep, without legal reason.

80. The Plaintiff packed her belongings and they were placed on the street while neighbors gathered and watched.

81. At her new residence, The Plaintiff experienced continued harassment from the RICO actors. Puerto Rico Police Precinct 466 called her from a hidden number using a 213 area code—the same area code as The Plaintiff's. Unaware it was them, she answered the call. An officer asked for her new location to investigate a break-in, and she, already fearful of the RICO scheme and its far-reaching influence, informed them she was mobile. In

November, a stranger approached The Plaintiff on Eduardo Conde Avenue and asked where she lived. She responded with "ahí" and pointed down the avenue away from her residence. Additionally, Miquel Pabón was aware of her new location, further compounding her fear and the ongoing harassment; he would stand in front of her apartment. The Plaintiff's full name was called out from the front of her home in the middle of the night. Afraid to look, she did not identify anyone, but since people in the neighborhood do not call her by her government name—most do not even know it—she feared it was either crooked police or Higuerey's henchmen. This intrusion into her new life highlights the relentless and invasive tactics of the RICO actors, underscoring the systemic corruption and abuse of power aimed at maintaining their control and evading accountability.

82. In November 2023, The Plaintiff received another sign that a hitman, rather than a lowly street thug, had been contracted after previous attempts failed. The gravity of this threat left no room for doubt, and given the reliability of past warnings, she knew she could not afford to ignore it. A self-reliant person who is used to helping others, The Plaintiff felt embarrassed to ask for assistance but recognized she desperately needed it. Her family, who had already supported her with food and necessities throughout the ordeal, could not do more, especially in the aftermath of COVID. Friends and family contributed to her GoFundMe campaign, allowing her to leave her apartment and Puerto Rico under duress. Additionally, a client paid for a three-night hotel stay before her flight, ensuring that both she and her dog could remain safe until they left. She said goodbye to no one, friends, kind neighbors, or her new landlord. She felt like a heel.

83. In December 2023, still in fear for her life, The Plaintiff remained extremely secretive about her whereabouts upon returning to the United States. She refrains from telling people where she lives, avoids attending events, and continues to alter her driving patterns and timing to evade detection. Despite these precautions, she began receiving strange phone calls. Afraid of the possibility of call tracing—especially given the elite technology that the RICO team could afford and the involvement of law enforcement, who typically have access to such equipment—she found no reassurance in the mere fact that she was far from Puerto Rico.

84. In June, 2023, under new duress and facing new signs of danger, The Plaintiff was once again forced to stop working and relocate to ward off any planned attacks. To further ensure her safety, she had to leave the country for a month to throw the RICO actors off her trail. Upon her return, she filed a police report with local authorities, but the fear remains pervasive.

85. The Plaintiff is still in ongoing therapy.

## Count 1

## Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)

1.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

2.  Defendants, including Gustavo Higuerey, Nilda Muñoz Vissepo, and associated entities and individuals, operated as part of a criminal enterprise engaged in racketeering activities. This enterprise is an ongoing organization involving various formal and informal associations that engage in a pattern of illegal conduct.

3.  Throughout the relevant period, Defendants have engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961-1968. The pattern includes, but is not limited to, the following illegal activities:

4.  Defendants made false statements regarding property ownership, lease agreements, and payment obligations.

5.  Defendants engaged in bribery to influence individuals or officials to further their illegal activities, including attempts to sway legal decisions or gain favorable treatment.

6.  Defendants used threats and coercive tactics to extract payments from Plaintiff and retaliated against Plaintiff for exercising her legal rights.

7.  Plaintiff was wrongfully evicted from her residence without due process, including acts of harassment and improper legal procedures.

8.  Defendants failed to maintain habitable living conditions, causing Plaintiff significant harm.

9.  Defendants engaged in or conspiring to engage in a murder-for-hire plot, reflecting the criminal nature and intent of the enterprise.

10. Defendants conspired to commit these illegal acts, working together to defraud and exploit Plaintiff, including coordinating efforts to obstruct justice and conceal their activities.

11. Defendant, Gustavo Higuerey, along with other members of the racketeering enterprise, engaged in a pattern of bad business practices. These practices included unethical, deceptive, and harmful conduct in their business operations. These actions were part of the broader scheme of racketeering activities described herein.

12. Defendants engaged in financial transactions designed to conceal the origins and nature of funds derived from fraudulent and collusive activities. These transactions involved funneling money through bank accounts and payment methods associated with the original owner, obscuring the true nature of the funds and their source.

### Count 2

### Violation of Due Process Rights

13. Plaintiff realleges and incorporates by reference all preceding paragraphs.

14. Defendants' actions in evicting Plaintiff and handling related legal proceedings lacked the proper legal process required under the 14th Amendment of the U.S. Constitution.

15. Defendants did not provide proper notice of eviction or legal proceedings as required by law.

16. Plaintiff was not given a fair opportunity to contest the eviction or related actions before a neutral tribunal.

17. The procedures followed by Defendants did not comply with legal standards for eviction or property disputes.

## Count 3

### Violation of Equal Protection Rights

18. Plaintiff realleges and incorporates by reference all preceding paragraphs.

19. Defendants discriminated against Plaintiff based on race or other protected characteristics, in violation of the Equal Protection Clause of the 14th Amendment.

20. Defendants engaged in actions that treated Plaintiff differently from others similarly situated based on race or other protected characteristics.

21. Plaintiff was subjected to harsher or different treatment compared to others in similar circumstances.

## Count 4

### Violation of the Eighth Amendment

22. Plaintiff realleges and incorporates by reference all preceding paragraphs.

23. Defendants' actions, including failure to maintain habitable living conditions and actions leading to severe health risks, may constitute cruel and unusual punishment under the Eighth Amendment.

24. Plaintiff was forced to endure unsanitary and dangerous living conditions, including lack of water and exposure to potential hazards like gas leaks.

25. The conditions and actions resulted in significant health risks and physical harm.

26. The cruel and unusual conditions inflicted emotional and physical distress on Plaintiff.

## Count 5

### Violation of the Fourth Amendment

27. Plaintiff realleges and incorporates by reference all preceding paragraphs.

28. Defendants' actions related to the eviction and property management may have involved unreasonable searches or seizures, violating the Fourth Amendment.

29. If Defendants conducted searches of Plaintiff's property without proper legal authorization.

30. If Defendants unlawfully seized Plaintiff's belongings or property.

## Count 6

## Violation of the First Amendment

31. Plaintiff realleges and incorporates by reference all preceding paragraphs.

32. Defendants retaliated against Plaintiff based on her speech or religious practices, in violation of the First Amendment.

33. Defendants took adverse actions against Plaintiff due to her exercise of free speech or religious practices.

34. Plaintiff's ability to freely practice her religion or express herself was hindered.

## Count 7

## Violation of Procedural Due Process

35. Plaintiff realleges and incorporates by reference all preceding paragraphs.

36. Defendants failed to adhere to proper legal procedures related to eviction, depriving Plaintiff of her right to a fair process under the 14th Amendment.

37. The eviction was carried out without proper legal notice or hearings.

38. Plaintiff was not given an adequate opportunity to present her case or challenge the eviction.

## Count 8

## Violation of Property Rights under the 14th Amendment

39. Plaintiff realleges and incorporates by reference all preceding paragraphs.

40. Defendants' actions related to property ownership and eviction deprived Plaintiff of her property rights without due process under the 14th Amendment.

41. Defendants evicted Plaintiff without proper legal justification.

42. Defendants neglected to uphold property maintenance standards.

## Count 9

### Violation of Right to Fair Housing

43. Plaintiff realleges and incorporates by reference all preceding paragraphs.

44. Defendants engaged in discriminatory practices related to housing, violating Plaintiff's right to fair housing under the 14th Amendment.

45. Defendants refused to offer fair housing opportunities based on race or other protected characteristics.

## Count 10

### Violation of the Right to Privacy

46. Plaintiff realleges and incorporates by reference all preceding paragraphs.

47. Defendants' actions infringed upon Plaintiff's right to privacy, including wrongful eviction and harassment.

48. Defendants conducted actions that violated Plaintiff's reasonable expectation of privacy.

## Count 11

### Fraudulent Misrepresentation

49. Plaintiff realleges and incorporates by reference all preceding paragraphs.

50. Defendants engaged in fraudulent misrepresentation by knowingly providing false information to Plaintiff, causing harm.

51. Defendants made false statements about the ownership of the property, the terms of the lease, or other material aspects related to Plaintiff's tenancy.

52. Defendants knew or should have known that the representations were false at the time they were made.

53. The false statements were made with the intent to deceive Plaintiff and induce her into actions she would not have taken otherwise.

54. Plaintiff relied on the false representations, which led her to make decisions based on the inaccurate information provided by Defendants.

55. As a result of relying on the fraudulent misrepresentations, Plaintiff suffered harm, including financial losses, emotional distress, and other damages.

### Count 12

### Intentional Infliction of Emotional Distress

56. Plaintiff realleges and incorporates by reference all preceding paragraphs.

57. Defendants intentionally engaged in conduct that was outrageous and extreme, causing severe emotional distress to Plaintiff. This count is based on the legal principles governing intentional infliction of emotional distress under Puerto Rican law and the Restatement (Second) of Torts § 46.

58. Defendants' actions were extreme and outrageous, beyond the bounds of decency expected in a civilized society. This includes, but is not limited to, actions such as

harassment, threats, or severe mistreatment related to Plaintiff's living conditions and legal matters.

59. Defendants acted with the intent to cause emotional distress or with reckless disregard for the likelihood of causing such distress. This conduct was deliberate or grossly negligent.

60. As a direct result of Defendants' conduct, Plaintiff experienced severe emotional distress. This distress was significant and had a substantial impact on Plaintiff's mental health and well-being.

61. The severe emotional distress was a direct and proximate result of Defendants' outrageous and intentional conduct.

62. Under Article 1802 of the Puerto Rico Civil Code, a person who causes harm to another through their fault or negligence is liable for damages. Intentional infliction of emotional distress is recognized as a form of tortious conduct under both Puerto Rican law and common law principles.

63. **Article 1802, Puerto Rico Civil Code**: "A person who by an act or omission causes damage to another, either with intent or through negligence, is liable for damages."

64. **Restatement (Second) of Torts § 46**: Defines the tort of intentional infliction of emotional distress as "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

Count 13

**Failure to Provide Adequate Living Conditions**

**(Breach of Warranty of Habitability)**

65. Plaintiff realleges and incorporates by reference all preceding paragraphs.

66. Defendants, as landlords or property managers, have breached the implied warranty of habitability by failing to provide adequate living conditions for Plaintiff. This count is based on the legal principles governing the warranty of habitability under Puerto Rican law and general landlord-tenant law.

67. Under Puerto Rican law and general legal principles, landlords are required to maintain rental properties in a condition that is fit for human habitation. This includes ensuring that the property meets basic standards of health, safety, and livability.

68. Defendants failed to uphold this warranty by: **Lack of Essential Services**: Failing to provide or maintain essential services such as water, electricity, and sanitation. For example, water was turned off, creating significant hardship and unsafe living conditions.

69. **Unsafe or Unhealthy Conditions**: Allowing conditions that made the property unsafe or unhealthy, such as issues related to gas leaks, which were discovered but not addressed.

70. **Inadequate Repairs and Maintenance**: Neglecting necessary repairs and maintenance that would ensure the property remained habitable, leading to significant disruptions and distress for Plaintiff.

71. The failure to provide adequate living conditions directly resulted in significant harm and inconvenience to Plaintiff, impacting her health and safety.

72. Under Puerto Rican law, the warranty of habitability requires landlords to maintain rental properties in a livable condition. The following legal principles apply:

73. **Article 1555, Puerto Rico Civil Code**: Implies that the landlord must deliver and maintain the property in a condition that is suitable for its intended use.

74. **Case Law**: Puerto Rican case law has established that landlords are responsible for ensuring that rental properties meet basic standards of habitability and for addressing any conditions that compromise the tenant's ability to live safely and comfortably.

## Count 11

## Conversion

75. Plaintiff realleges and incorporates by reference all preceding paragraphs.

76. Conversion is the wrongful exercise of dominion or control over the personal property of another, which deprives the owner of their rights to the property. In this case, the elements of conversion are:

77. Plaintiff owned or had lawful possession of certain personal property (describe specific property if applicable, e.g., furniture, personal items, etc.).

78. Defendants, without Plaintiff's consent, exercised control over Plaintiff's property in a manner that was inconsistent with Plaintiff's rights. This could include:

79. Illegally taking possession of Plaintiff's property.

80. Using or retaining possession of Plaintiff's property without authorization.

81. The actions of Defendants deprived Plaintiff of the use and enjoyment of their property. This includes:

82. The property was either permanently removed or Plaintiff was significantly deprived of its use.

83. Under general principles of tort law and Puerto Rican law, conversion is a civil wrong for which the injured party is entitled to seek damages. The following legal principles apply:

84. **Civil Code of Puerto Rico**: Provides general tort principles that may be applied to conversion claims.

85. **Restatement (Second) of Torts § 222A**: Defines conversion as an act of dominion over chattels (personal property) that is inconsistent with the rights of the owner.

86. Plaintiff alleges that Defendants engaged in conversion by: Taking Plaintiff's property without permission, wrongfully retaining possession of Plaintiff's property, preventing Plaintiff from reclaiming or using it, using Plaintiff's property in a manner not authorized by Plaintiff.

## Count 15

## Racial Discrimination

87. Plaintiff realleges and incorporates by reference all preceding paragraphs.

88. Racial discrimination occurs when an individual or entity treats someone unfavorably because of their race or ethnicity. In this case, the elements of racial discrimination include:

89. Plaintiff belongs to a protected class based on race or ethnicity.

90. Defendants took actions that adversely affected Plaintiff due to her race or ethnicity. Specific discriminatory actions include:

91. Treating Plaintiff differently compared to others outside her protected class in similar situations.

92. Creating or allowing a hostile environment based on Plaintiff's race or ethnicity.

93. Denying Plaintiff access to housing or other benefits based on racial discrimination.

94. The adverse actions taken by Defendants were motivated by Plaintiff's race or ethnicity.

95. Racial discrimination is prohibited under both federal and Puerto Rican law. The following legal principles apply:

96. **Federal Law: Civil Rights Act of 1964 (Title VIII)**: Prohibits discrimination in housing based on race, color, religion, sex, or national origin, and **42 U.S.C. § 1981**: Provides protection against racial discrimination in the making and enforcement of contracts.

97. **Puerto Rican Law: Law No. 44 of 1985**: Prohibits discrimination based on race, color, gender, religion, or social status in various areas, including employment and housing, and **Puerto Rican Constitution**: Provides for equal protection under the law and prohibits discrimination based on race.

98. Plaintiff alleges that Defendants engaged in racial discrimination by: Making decisions or taking actions regarding housing, eviction, or other benefits that were influenced by Plaintiff's race or ethnicity.

99. Employing racial stereotypes or prejudices in dealings with Plaintiff.

100.    Subjecting Plaintiff to harassment or intimidation based on her race or ethnicity.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a. Determine that the actions of defendants were taken negligently, knowingly, intentionally, or recklessly.

b. Determine that defendants' actions violated Plaintiff's constitutional and legal rights.

d. Provide for compensatory damages, in the amount not less than Eight Million Dollars, as to all defendants.

e. Provide for punitive damages, in an amount considered sufficient to punish defendants' grossly negligent conduct and to deter similar misconduct from recurring in the future, an amount that should not be less than Twenty Four Million Dollars.

f. Provide for preliminary and permanent injunctive relief to prevent further unlawful conduct by Defendants, including:

1. Plaintiff requests that the Court issue an injunction directing or recommending that appropriate law enforcement agencies, including but not limited to the Federal Bureau of Investigation (FBI) and other relevant federal or state authorities, conduct a comprehensive investigation into the criminal activities and misconduct alleged in this lawsuit. The Plaintiff asserts that the evidence presented indicates potential violations of federal criminal law, including but not limited to RICO violations, and that such investigation is necessary to ensure accountability and prevent further harm.

2. Direct the Federal Bureau of Investigation (FBI) and any and all relevant federal agencies to thoroughly investigate the racketeering activities, including fraudulent misrepresentation, bribery, extortion, and money laundering, as detailed in the RICO count. Ensure that these agencies provide support in the investigation and litigation of this case.

3. Order that federal agencies coordinate with local law enforcement authorities to ensure a comprehensive approach to addressing and preventing any further criminal activities related to the RICO violations.

4. Plaintiff respectfully requests that the Court order a comprehensive investigation into the professional conduct of Attorney Nilda Muñoz Vissepo, Attorney Annette

Martinez Orabona, Attorney Rafael Rodríguez Rivera, and other relevant parties, addressing allegations of rights violations, legal malpractice, misconduct, and conspiracy as outlined in the complaint. For Attorney Javier Abraham Rivera Torres and Judge Valerie Cintrón Concepción, Plaintiff asks for judicial oversight and expedited action by the Supreme Court of Puerto Rico concerning the existing complaints filed against them, as well as a review of any new allegations related to this federal suit. Upon conclusion of the investigation, Plaintiff requests that the findings be referred to the appropriate disciplinary authorities, including the Supreme Court of Puerto Rico, and that necessary actions, such as disbarment, suspension, or other sanctions, be taken to uphold the integrity of the legal and judicial systems.

5. Additionally, The Plaintiff requests measures to prevent these attorneys from continuing to engage in any legal practice that might further harm individuals or engage in unethical conduct.

6. Grant injunctive relief to protect The Plaintiff from any further retaliatory actions, including threats or attempts of murder for hire. Ensure measures are in place to safeguard The Plaintiff's safety and security.

7. Grant confidentiality orders to keep the identities and contact information of parties and witnesses confidential.

8. Plaintiff respectfully requests that the Court implement enhanced physical security measures to ensure the safety and protection of all parties involved. This should include, but not be limited to:

a. Establishing heightened security protocols during court proceedings to safeguard against potential threats and ensure a secure environment for all participants.

b. Providing personal protection for The Plaintiff, if deemed necessary, to address any immediate or ongoing threats to her safety arising from the case. This may include measures such as protective details or other security arrangements tailored to her specific circumstances.

c. Given the serious threats and ongoing risks to The Plaintiff's safety, The Plaintiff requests that the Court consider providing relocation assistance as part of the protective measures in this case. Although such assistance is not commonly granted in civil cases, it is deemed essential under these circumstances. Relocation assistance would help ensure The Plaintiff's continued safety and well-being by facilitating her move to a secure and safe environment, away from any potential threats. This measure is crucial to mitigate the risks posed by the ongoing harassment and danger, allowing The Plaintiff to focus on her legal proceedings without fear for her safety.

9. A declaration that Defendants' actions were unlawful and violated Plaintiff's rights under applicable laws, including:

a. finding that the eviction was unlawful and that Defendants are liable for damages caused by the breach of contract.

b. A declaration that the actions of Defendants constitute a violation of Plaintiff's rights under federal and Puerto Rican law.

g. For the reasonable costs and attorney's fees incurred in bringing this action, as allowed under applicable statutes and laws.

h. Provide for treble damages in no less than Twenty Four Million.

i. For Civil Penalties that may be available under law for violations of federal and state statutes, including RICO and anti-discrimination laws.

j. For any other relief, as the Court may deem just and proper, including but not limited to any additional relief necessary to fully address the harm suffered by Plaintiff and to ensure full compliance with the law.

Signature: _Randa M. Johnson_

Randa Johnson
124 Fern Street
Waterbury, CT 06704
Phone Number: 213-399-6939
Email: LittlePearlEd@gmail.com